UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

_____
                                    :
RENE ROSARIO,                       :
                                    :
        Petitioner,                 :    Civ. No. 14-5592 (NLH)
                                    :
    v.                              :    OPINION
                                    :
UNITED STATES OF AMERICA,           :
                                    :
        Respondent.                 :
_____:

APPEARANCES:
Rene Rosario, No. 64817-050
FCI Fort Dix
P.O. Box 2000
Joint Base MDL, NJ 08640
     Petitioner <u>Pro</u> <u>Se</u>

Diana V. Carrig, Esq.
Office of the United States Attorney
401 Market Street
Camden, NJ 08101
     Counsel for Respondent

<u>HILLMAN, District Judge</u>

        Presently before the Court is the Amended Motion to Vacate,

Set Aside, or Correct Sentence of Rene Rosario ("Petitioner")

brought pursuant to 28 U.S.C. § 2255 (the "Petition").  ECF No.

11.  In response to this Court's Order to Answer, ECF No. 12,

Respondent the United States of America filed its Answer, ECF

No. 30, and Petitioner filed a Reply, ECF No. 35.  Both the

Petitioner and the Respondent also submitted supplemental letter

briefs.  <u>See</u> ECF Nos. 37 (petitioner), 38 (respondent).  For the

1

reasons discussed below, the Court will deny the Petition and decline to issue a certificate of appealability

I.    BACKGROUND

    A.    <u>Criminal Proceedings</u>

    In July 2012, a detective with the New Jersey State Police ("NJSP") notified an agent with the United States Drug Enforcement Administration ("DEA") that Petitioner Rene Rosario was looking for a source of supply for cocaine. ECF No. 30 at 2. Later that summer, on August 24, 2012, Rosario and co-defendant Winston Womble met with an undercover law enforcement officer ("UC") and a confidential source ("CS") at a Starbucks in Cherry Hill, New Jersey, to discuss purchasing ten kilograms of cocaine. <u>Id.</u> at 2-3. At the meeting, Petitioner vouched for Womble, who was meeting the CS and UC for the first time, stating that Womble was his brother-in-law and that they were together. <u>Id.</u> at 3. Rosario and Womble told the UC that Camden was suffering from a cocaine shortage, and they had "[s]o many people waiting that we got lined up" as customers, some of whom "give us money ahead of time." <u>Id.</u>

    During the meeting, Petitioner discussed the proposed drug transaction and made numerous statements such as suggesting that the UC "[c]heck my name in the streets," stating that he did not "rob nobody [or] beat nobody for their money," and that "[w]e

can move a whole lot 5-10 keys." Id. Both Womble and Petitioner confirmed that "[w]e can handle 10." Id.

Petitioner and Womble agreed to buy new phones to be used for communicating with the UC. Id. at 4. After purchasing the phones, they rejoined the UC at Starbucks. Id. Petitioner told the UC that he and Womble did not want to switch cars to conduct the transaction as suggested by the UC: "[L]et's talk a little bit more real fast. . . . I feel like . . . it's kind of weird giving you . . . 320 [presumably, $320,000] . . . taking your car and taking another car. You know what I'm saying?" Id. The UC suggested that they start off "smaller," to which Petitioner responded, "five [kilograms] is fine too . . . [c]ause the money's not the problem . . . [we] could probably do that ourselves." Id. The men agreed to the car switch with the UC's brother accompanying Womble with the drugs and Rosario accompanying the UC with the money until each side was able to verify the authenticity of the transaction. Id. At the meeting, the UC asked, "who's responsible if something is not right. Am I dealing with you or am I dealing with you?" Petitioner responded, "You dealing with both of us." Id.

On September 25, 2012, Petitioner, Womble, and another associate of Petitioner's met with the CS, who recorded the meeting. Id. When Petitioner and Womble arrived, Petitioner again raised the issue of the logistics of the proposed

3

transaction - the car switch - because Petitioner wanted an
opportunity to check the cocaine before advancing payment.  Id.
at 5.  Petitioner discussed proceeding cautiously:  Rosario
stated, "We're taking more chances than he [the UC] is.  We're
coming up with the cash.  He ain't gonna beat us or anything."
Id.  Womble confirmed that they had the money for five kilograms
but wanted ten kilograms, and stated "[w]e want as much as we
can get."  Id.  Petitioner confirmed that, telling the CS,
"[j]ust tell him [UC] that we can get five.  It's the best way
to check the material.  We gotta agree to that.  Once that's
established, then work with us after that."  Id. at 5-6.
Petitioner said that he wanted to move forward with the purchase
"ASAP" and that he preferred not to

> keep going to people I'm going to.  They too high, and
> I don't feel like tripping to go see these people.
> Not the regular people we been dealing with.  So right
> now, we ready to do some more stuff.  So talk to him
> [the UC] to try to make something happen.

Id. at 6.  Petitioner also stated that he hoped that the cocaine
would be "really go[o]d product," that "[w]e're ready for at
least five [kilograms].  We can do five all day long.  We need
it," and that, "I'm not rushing him but we can't stay dry."  Id.

On October 1, 2012, Petitioner and Womble met the UC and CS
at a restaurant inside the Promenade Shopping Center in Evesham,
New Jersey.  Id. at 7.  The UC had agreed to show Petitioner and
Womble the ten kilograms of cocaine.  Id.  They walked to the

UC's car, where the UC and another undercover officer displayed ten kilograms of cocaine to Petitioner and Womble. Id. Womble picked up one kilogram of cocaine, cut into it with a knife to verify its contents, and returned the kilogram to the car. Id. Petitioner, Womble, and the UC then returned to the restaurant, where Petitioner and Womble informed the UC that they would have the cash for five kilograms of cocaine within two days. Id. They each shook the UC's hand and left the restaurant. Id.

Shortly after leaving the restaurant, the CS informed the UC that Petitioner and Womble wanted to talk to the UC again. Id. at 8. The UC directed the CS to tell them to return to the restaurant. Id. They returned to the restaurant and resumed their conversation with the UC. Petitioner explained that after seeing the cocaine, they were ready to proceed with the deal that day. Id. They explained that they only had enough money to purchase four kilograms of cocaine but that they would return to purchase the remaining six kilograms in the next few days. Id. When the UC asked them when they would purchase the remaining six, Petitioner replied "[a]s soon as I can contact the right [person], I can contact the right [person], the next day." Id. After discussing logistics and confirming the price of $33,000 per kilogram, Petitioner told the UC that it would be quicker if they conducted the transaction at Starbucks. Id.

Petitioner arranged to meet the UC later that evening at the Starbucks in Cherry Hill, New Jersey.  _Id._

Petitioner drove Womble in a Ford Escape to the Starbucks, where they told the UC that they had the money to purchase the four kilograms of cocaine with them in a separate car.  _Id._ at 9.  Petitioner and Womble then left to get the other car, a Honda, with Petitioner returning in the Ford and Womble returning in the Honda.  _Id._  Petitioner opened the rear of the Honda to show $130,000.  _Id._  The UC then handed Womble a key to a car he said contained four kilograms of cocaine with instructions for opening the hidden compartment that contained the cocaine.  _Id._

Petitioner saw a suspicious car and instructed Womble to drive away.  _Id._  The UC retrieved the car key and instructions from Womble and, after that, gave the command to have them arrested.  _Id._  Law enforcement officers stopped and arrested Womble and Petitioner in their separate vehicles.  _Id._  When officers searched a concealed compartment in Womble's Honda, they found a loaded .40 caliber handgun and approximately $130,000.  _Id._

After his arrest, Petitioner was charged by criminal complaint with conspiracy to distribute and possession with intent to distribute in excess of five hundred grams of cocaine

in violation of 21 U.S.C. § 846.[1]  See No. 13-cr-95, ECF No. 1.

The Court appointed Richard Sparaco, Esquire, to represent

Petitioner.  No. 13-cr-95, ECF No. 3.  The Government provided

discovery including reports, recordings, and transcripts

summarizing each of the three meetings.  No. 14-cv-5592, ECF No.

30 at 10.  Petitioner waived his right to an indictment and

agreed to plead guilty by information to the offense charged in

the criminal complaint.  See No. 13-cr-95, ECF Nos. 9

(information), 10 (waiver of indictment), 12 (plea agreement).

On February 6, 2013, Rene Rosario entered a guilty plea

before the Court to a one count information charging him with

conspiring with Winston Womble and others to distribute and

possess with intent to distribute more than 500 grams of

cocaine, in violation of 21 U.S.C. § 846.  No. 13-cr-95, ECF

Nos. 11 (minute entry), 26 (transcript).  Petitioner's plea

agreement explained the potential penalties from his plea,

including the five year mandatory minimum sentence and forty

year maximum sentence.  No. 13-cr-95, ECF No. 12, Plea Agreement

at 1-2.  In addition, the plea agreement included a stipulation

pertaining to the possibility that the Court, at sentencing,

---

[1]His co-defendants, Winston Womble and Jerel Clark were also
charged with the same offense in the same complaint.  See No.
13-cr-95, ECF No. 1.

would find that Rosario was a career offender under U.S.S.G. § 4B1.1. Id., Sch. A, ¶ 5.

During the guilty plea colloquy, the Court questioned Petitioner about his understanding and acceptance of the plea agreement and concluded that Rosario understood and accepted the plea agreement, and that he knowingly, intelligently, and voluntarily waived his right to proceed to trial. See No. 13-cr-95, ECF No. 26. The Government then summarized the plea agreement, including the statutory maximum sentence of up to forty years' imprisonment, the mandatory minimum of five years' imprisonment, and the possible application of the Career Offender Guideline. Id. at 9-11. Petitioner stated that he understood the plea agreement, reviewed it with Mr. Sparaco, and then signed it:

> THE COURT:       Did you sign it after you reviewed it with Mr. Sparaco?
>
> THE DEFENDANT: Yeah. He reviewed everything with me.
>
> THE COURT:       Did you sign it after you read it yourself?
>
> THE DEFENDANT: Yes.
>
> THE COURT:       All right.  Did you understand it?
>
> THE DEFENDANT: Yes.  He explained each paragraph as we went along.
>
> THE COURT:       All right.  Good.  Do you have any questions about it now?
>
> THE DEFENDANT: No.

Id. at 11-12; 13-14.  The Court advised Petitioner of the maximum penalties and Petitioner stated that he understood them. Id. at 18-19.  The Court also explained the Sentencing Guidelines, including the application of the career offender provision and that Petitioner would not be able to withdraw his plea if he received a sentence that was "different than what you wished for or hoped for or was predicted."  Id. at 19-24. Petitioner stated that he understood.  Id. at 24.

The Court outlined the elements necessary to prove the offense charged and Petitioner stated that he understood each element of the offense.  Id. at 28-29.  The Government then questioned Petitioner about the factual basis for the offense charged:

> MS. CARRIG:     Mr. Rosario, from in or about August, 2012, through on or about October 1, 2012, did you agree with others, including but not limited to Winston Womble, to participate in the purchase of approximately four kilograms of cocaine?
>
> THE DEFENDANT: Yes.
>
> MS. CARRIG:     Did you know that such an agreement violated federal narcotics laws?
>
> THE DEFENDANT: Yes.
>
> MS. CARRIG:     As part of your agreement, did you introduce Winston Womble to an individual you believed could broker the sale of kilograms of cocaine?
>
> THE DEFENDANT: Yes.

MS. CARRIG:      And did that person subsequently introduce
                 you and Mr. Womble to a person whom you
                 later learned was an undercover law
                 enforcement officer?

THE DEFENDANT: Yes.

MS. CARRIG:      On or about August 24th of 2012, did you and
                 Mr. Womble meet with the undercover officer
                 at a Starbucks in Cherry Hill, New Jersey?

THE DEFENDANT: Yes.

MS. CARRIG:      And during that meeting, did you and Mr.
                 Womble discuss purchasing kilogram
                 quantities of cocaine from the undercover
                 officer for between $32,500 to $33,000 per
                 kilogram?

THE DEFENDANT: Yes.

MS. CARRIG:      On or about October 1st of 2012, did you and
                 Mr. Womble meet with the undercover officer
                 at a restaurant in the Promenade Shopping
                 Center in Evesham, New Jersey?

THE DEFENDANT: Yes.

MS. CARRIG:      And during that meeting, did you and Mr.
                 Womble again talk about buying kilogram
                 quantities of cocaine from the undercover
                 officer?

THE DEFENDANT: Yes.

MS. CARRIG:      During that meeting, did you and Mr. Womble
                 walk out to the parking lot to the
                 undercover officer's car and look at
                 approximately ten kilograms of cocaine that
                 was contained in the car?

THE DEFENDANT: Yes.

MS. CARRIG:      And while in your presence, did Mr. Womble
                 reach into one of the undercover officer's
                 cars, pick up a kilogram of cocaine and cut
                 into that kilogram?

THE DEFENDANT: Yes.

MS. CARRIG:      Did Mr. Womble cut into that kilogram of
                 cocaine to ensure that it actually contained
                 cocaine?

THE DEFENDANT: Yes.

MS. CARRIG:      And shortly thereafter, did you and Mr.
                 Womble go back into the restaurant and agree
                 with the UC to buy four kilograms of cocaine
                 later that evening?

THE DEFENDANT: Yes.

MS. CARRIG:      Later that evening, that's October 1st of
                 2012, did you arrange for you and Mr. Womble
                 to meet with the undercover officer at the
                 Starbucks in Cherry Hill to make the
                 purchase?

THE DEFENDANT: Yes.

MS. CARRIG:      And did you and Mr. Womble bring with you
                 approximately $130,000 in cash?

THE DEFENDANT: Yes.

MS. CARRIG:      . . . . [W]as that [money] contained inside
                 the black Honda Accord?

THE DEFENDANT: Yes.

MS. CARRIG:      And did you and Mr. Womble bring that money
                 for the purpose of buying the four kilograms
                 of cocaine?

THE DEFENDANT: Yes.

MS. CARRIG:      At the undercover officer's request, did you
                 show that buy money to the undercover
                 officer?

THE DEFENDANT: Yes.

MS. CARRIG:      And do you agree that four kilograms of
                 cocaine is a distribution amount of cocaine
                 rather than a personal use amount of
                 cocaine?

THE DEFENDANT: Yes.

MS. CARRIG:          And did you do all of these things that I
                     asked you about willfully, that is,
                     voluntarily and not by mistake?

THE DEFENDANT: Yes.

MS. CARRIG:          And are you guilty of conspiring with Mr.
                     Womble and others to distribute and possess
                     with intent to distribute cocaine as alleged
                     in the Information?

THE DEFENDANT: Yes, I am.

Id. at 30-33.  The Court concluded that Petitioner's guilty plea

was knowing, voluntary, and "intentionally entered into with an

independent basis in fact, containing each of the essential

elements of the offense."  Id. at 35.  Notably, when the Court

asked if Petitioner was satisfied with the performance of his

counsel, he replied "very much."  Id.

Before sentencing, the Probation Office determined that

based upon Petitioner's three prior drug trafficking

convictions, Petitioner qualified as a Career Offender within

the meaning of U.S.S.G. § 4B1.1.  No. 14-cv-5592, ECF No. 30 at

15.  Specifically, Petitioner had been convicted of the

following drug trafficking felonies:

> (1) FIRST FELONY DRUG TRAFFICKING OFFENSE, PSR ¶ 46:
>
> Possession of a controlled dangerous substance ("CDS")
> with the intent to distribute within 1,000 feet of
> school property in the New Jersey Superior Court of
> Camden County (Camden Co. Ind. No. 95-02-0413), for
> which he was sentenced on or about June 30, 1995 to 3
> years' imprisonment.  Rosario was released to New
> Jersey's Intensive Supervision Program ("ISP") on

November 30, 1995 and – after having committed the
below described offense (PSR ¶ 48)— was terminated
from the ISP Program and returned to custody for this
offense on or about March 21, 1997.  Rosario was
released to home confinement on July 24, 1998, paroled
on November 9, 1998 – approximately 14 years prior to
his commission of the present offense, and terminated
from parole the following year, on November 28, 1999.


(2) SECOND FELONY DRUG TRAFFICKING OFFENSE, PSR ¶ 48:

Distribution of CDS within 1,000 feet of a school zone
in the New Jersey Superior Court, Camden County
(Camden Co. Ind. No. 97-04-0973) for which he was
sentenced on or about August 22, 1997 to five years'
imprisonment.  Rosario was released to home
confinement, paroled and terminated from parole on
this offense on the same dates as listed above).


(3) THIRD FELONY DRUG TRAFFICKING OFFENSE, PSR ¶ 50:

Conspiracy to possess CDS with intent to distribute in
the New Jersey Superior Court for Camden County
(Camden Co. Ind. No. 04-07-2659), for which he was
sentenced on or about February 25, 2005 to five years'
imprisonment.  Rosario was paroled on this offense on
April 2, 2007.


Id.

Applying the Career Offender Guideline, Probation

determined that Rosario had a total offense level of 31 and a

criminal history category of VI, which corresponded to an

advisory Guidelines range of 188 to 235 months with a statutory

mandatory minimum sentence of five years.  Id. at 16.

In his plea agreement, Petitioner reserved the right to challenge the application of the Career Offender Guideline. After receiving the draft PSR, he objected to the application of three criminal history points for the felony drug conviction described in Paragraph 46 of the pre-sentence investigation report ("PSR"), but conceded the applicability of the Career Offender Guideline. Id. ("Defendant acknowledges that ultimately his Criminal History Category becomes VI because of the applicability of the Career Offenders Guideline under § 4B1.1. Although the plea agreement allows for the defendant to contest its applicability, after our investigation and review, the defendant now concedes his qualifies as a Career Offender under § 4B1.1."). The Probation Office responded by referring to records from the New Jersey State Parole Board, which confirmed that because Petitioner violated his intensive supervision program ("ISP") by committing his second felony drug offense, his ISP was revoked and he was, in fact, in custody on the offenses summarized in PSR paragraphs 46 and 48, during the fifteen-year period preceding his commission of the present offense. Id. In addition, Petitioner's counsel filed a sentencing brief in which he sought a downward variance based upon his lack of a violent criminal history, strong family support, minor role in the offense, and other factors. Id. at 17.

At the sentencing hearing on September 5, 2013, Mr. Sparaco withdrew his objection to the application of three criminal history points for the PSR paragraph 46 conviction, explaining that Petitioner

> was paroled November 9th of 1998. I checked with my client. He confirmed it. It may have been the summer of '98 which still would have been within 14 years of the commencement of the present offense.

No. 13-cr-95, ECF No. 25 at 3. Petitioner did not contest his counsel's withdrawal of the objection or the statement that he confirmed that he was in custody as late as the summer of 1998.

The Court accepted the Probation Department's determination that the Career Offender provision in U.S.S.G. § 4B1.1 applied to Petitioner and, therefore, his offense level was 31 with Criminal History Category of VI, yielding an advisory range of 188 to 235 months' imprisonment. Id. at 9. Mr. Sparaco argued for leniency and a downward variance for numerous reasons including Petitioner's non-violent history, and Petitioner himself requested leniency from the Court, speaking about his children and how they needed him home. Id. at 10-19. Petitioner explained his choice to participate in the conspiracy as follows:

> It's not to justify what I did because I knew exactly what I was doing. But . . . I didn't think because I wasn't touching anything, I was – I wasn't going to keep doing it. I just needed a couple of dollars to hold me off until I got myself situated again.

<u>Id.</u> at 18-19.

During the sentencing hearing, the violent tendencies of
Petitioner's co-defendant were discussed:

MS. CARRIG:    There are several things that I take issue
with that Mr. Rosario and Mr. Sparaco said,
and I think they are very indicative of drug
trafficking here in Camden in general.  In
many respects, Mr. Rosario is a very typical
defendant that we see in these cases.  The
guidelines are extraordinarily high.  He has
three prior drug trafficking convictions.
He's done jail time, it hasn't changed him.

Mr. Sparaco said that Mr. Rosario is not a
violent man, he's not a violent person.  And
it's true, there's no criminal history of
violence.  But he was running in a very
violent game.  He was a high-level drug
trafficker in Camden, and he was the one who
recruited Winston Womble to come into this
drug deal. . . Mr. Rosario had the contact
with the confidential informant and the
undercover officer and he brought in Womble.

Womble is a violent guy.  He has a prior for
a weapons possession and he had in his
possession when he was arrested a .40
caliber loaded Smith & Wesson.  He had
another gun in his home.  And, if you
recall, codefendant Jerel Clark was sent to
Winston Womble's mother's house to pick up a
MAC-11 machine gun with two extended clips.
So Womble was a very dangerous man.

And, again, I don't mean to cast aspersions
on Mr. Rosario with respect to it. The drug
trafficking game in Camden is inherently a
dangerous game, and to run in that circle,
there's always a potential for violence.

THE COURT:    I believe Mr. Womble's weapon in the car had
hollow — there was a magazine with hollow-
point bullets as well, if I remember.

| | |
|---|---|
| MS. CARRIG: | I don't have that detail in my memory, but I can find it for Your Honor. I do recall that it was loaded. And he brought it to the drug deal when he brought $130,000 cash, which Mr. Rosario also knew about, also a very dangerous situation to be walking around with $130,000 cash at a strip mall . . . . |
| THE COURT: | To be clear, there is no indication that the gun was Mr. Rosario's. |
| MS. CARRIG: | No indication whatsoever. The gun was Mr. Womble's. That gun belonged to Mr. Womble, and Mr. Womble was the one who brought it there. |
| | I – I think 188 to 235 months is an extraordinarily long amount of time. 15 to almost 20 years in prison is an outrageously long period of time. . . . |
| | And how much time is enough time, Your Honor? I think 180 – 188 months is certainly enough time – is certainly enough time. |

Id. at 20-22.

After the Government conceded that Petitioner should only receive a sentence below or at the low end of the Guideline range, Mr. Sparaco focused his advocacy on why an even lesser sentence would still send an appropriate message to Petitioner:

| | |
|---|---|
| Mr. Sparaco: | I think Ms. Carrig did hit it on the head. How much is enough? And I think that maybe a message can be given to my client that even a slight break on this sentence will give him some encouragement that there is a future for him. And if it's 15-and-a-half years, it just seems to be just a bit too much under the circumstances. |

Id. at 24.

The Court granted Petitioner a two-level downward variance based upon his lack of a history for violence, his role in the offense, his attempt to cooperate with the Government, his difficult upbringing, his lengthy pre-sentencing incarceration, his role as a father, and his strong family support. Id. at 28. Within the newly reduced range of 151 to 188 months, which corresponded to an offense level of 29 and Criminal History Category VI, the Court sentenced Petitioner to 168 months' imprisonment and five years of supervised release. Id. at 32-33. See also No. 13-cr-95, ECF No. 16 (judgment). The Court explained that the sentence was necessary to punish Petitioner and deter others from committing serious drug trafficking offenses. The Court also noted the quantity of drugs involved in the transaction and that "[t]his was not a one-shot deal by a couple of amateurs . . . and you did it in a place where people are going about their daily lives, shopping and at a risk because of the danger inherent in this kind of activity in a commercial zone." No. 13-cr-95, ECF No. 25 at 30-31.

B. Appeal

Petitioner filed a timely Notice of Appeal on September 11, 2013. No. 13-cr-95, ECF No. 14. Sarah Gannett, Esquire, from the Federal Public Defender's Office was appointed to represent Petitioner by order entered October 1, 2013; she entered her appearance on his behalf on November 5, 2013. No. 13-3864 (3d

Cir.).  Counsel, on behalf of Petitioner, requested his trial
court plea and sentencing transcripts, which were produced on
December 2, 2013.  See id.  Attorney Gannett filed a motion for
voluntary dismissal of the appeal on February 24, 2014.  See No.
13-3864 (3d Cir.).  Petitioner signed that motion, stating, "I,
Rene Rosario, hereby consent to the dismissal of Appeal Number
1303864 for the reasons stated in the foregoing motion."  Id.
No specific reasons were stated in the motion, other than that
Petitioner had consulted with his attorney regarding the
withdrawal and that Petitioner sought to withdraw the appeal
pursuant to Federal Rule of Appellate Procedure 42(b).  See id.
By Order dated February 24, 2014, the Third Circuit dismissed
Petitioner's appeal.  Id.

    C.    § 2255 Motion

    Petitioner timely filed a Motion to Vacate, Set Aside, or
Correct Sentence pursuant to 28 U.S.C. § 2255, ECF No. 1, and
thereafter filed an Amended Motion, ECF No. 11.  In the Amended
Petition, Plaintiff alleges that both his trial counsel and
appellate counsel were ineffective.  Specifically, he argues
that his trial counsel was ineffective because (1) trial counsel
failed to correctly inform Petitioner of the factual predicates
for a § 846 conspiracy violation, and such failure rendered
Petitioner's guilty plea unknowing and unintelligent; (2) trial
counsel failed to investigate the prior crimes used as predicate

offenses for a career offender designation and failed to object to their use in support of such designation; and (3) trial counsel failed to object to certain statements about Petitioner's co-defendant made by the government at sentencing. ECF No. 11 at 7-11. As to the prejudice Petitioner has suffered, he asserts that he would not have pleaded guilty and would have taken his chances at trial (ground one), that he would not have been classified as a career offender and his sentence would have been different (ground two), and that there is a reasonable probability that his sentence would have been lower (ground three). Id.

As to his appellate counsel, Plaintiff argues that she was ineffective for failing to raise meritorious issues on appeal. Id. at 11. Plaintiff states that his appellate counsel should have raised such issues as the insufficient basis for his guilty plea and the improper use of a crime as a predicate offense for his career offender designation. Instead, Plaintiff asserts that his appellate counsel urged him not to prosecute the appeal and to withdraw it voluntarily. According to Petitioner, if these issues were raised on appeal, there is a reasonable probability that the Court of Appeals for the Third Circuit would have remanded the case for further proceedings.

II.   STANDARD OF REVIEW

A prisoner in federal custody under a federal sentence "may move the court which imposed the sentence to vacate, set aside or correct the sentence" upon the grounds that (1) "the sentence was imposed in violation of the Constitution or laws of the United States," (2) "the court was without jurisdiction to impose such sentence," or (3) "the sentence was in excess of the maximum authorized by law."  28 U.S.C. § 2255(a).  The Court, in considering a § 2255 motion, must accept the truth of a movant's factual allegations unless they are frivolous on the basis of the existing record.  See United States v. Booth, 432 F.3d 542, 545 (3d Cir. 2005).  A court may deny the motion without holding an evidentiary hearing if "the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief."  28 U.S.C. § 2255(b).

III. DISCUSSION

The Sixth Amendment guarantees criminal defendants the right to effective assistance of counsel.  See Strickland v. Washington, 466 U.S. 668, 685–86 (1984).  A defendant who alleges ineffective assistance must satisfy the two-part test outlined in Strickland:

> First, the defendant must show that counsel's performance was deficient.  This requires showing that counsel made errors so serious that counsel was not functioning as "counsel" guaranteed the defendant by the Sixth Amendment.  Second, the defendant must show

that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

Id. at 687.

To show deficient performance, "the defendant must show that counsel's representation fell below an objective standard of reasonableness . . . under prevailing professional norms." Id. at 686-88. A petitioner must identify the particular acts or omissions that are challenged as unprofessional. See id. at 690. Under this first prong of the Strickland test, scrutiny of counsel's conduct must be "highly deferential." See id. at 689. Indeed, "[c]ounsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." Id. at 690. The reviewing court must make every effort to "eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." Id. at 689. If counsel makes "a thorough investigation of law and facts" about his plausible options, then counsel's strategic choices are "virtually unchallengeable." Gov't of Virgin Islands v. Weatherwax, 77 F.3d 1425, 1432 (3d Cir. 2006) (citing Strickland, 466 U.S. at 690-91).

The second prong of the Strickland test requires the petitioner to prove prejudice.  See Stickland, 466 U.S at 693. To demonstrate prejudice, the defendant must show that counsel's deficient performance "actually had an adverse effect on the defense."  Id. at 693.  "The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome."  Id. at 694.  "The likelihood of a different result must be substantial, not just conceivable."  Harrington v. Richter, 562 U.S. 86, 112 (2011).

In the context of a guilty plea, the prejudice prong requires that defendant "show that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial."  Hill v. Lockhart, 474 U.S. 52, 59 (1985).  Only attorney errors that affect the outcome of a criminal proceeding will be grounds for habeas relief.  Strickland, 466 U.S. at 691.  The requirement of prejudice reflects the substantial interest in the finality of guilty pleas that would be too easily undermined by defendants seeking a more favorable outcome to challenge a plea after the fact.  Hill, 474 U.S. at 58.

In the first ground for relief in his Petition, Petitioner argues that his trial counsel was ineffective by wrongly

advising him that "simply referring a drug customer to a supplier was sufficient to support a conspiracy conviction" which resulted in an "unknowing and unintelligent guilty plea." Am. Pet. at 7-8; Reply at 4-5. Petitioner cites United States v. Pressler, 256 F.3d 144, 153 (3d Cir. 2001), in support of his argument that providing an introduction or referral is insufficient to establish conspiracy under 21 U.S.C. § 846.

To establish a conspiracy under § 846, the government must prove (1) that two or more persons agreed to distribute and possess with the intent to distribute a controlled substance; (2) that the defendant was a party to or member of that agreement; (3) that the defendant joined the agreement or conspiracy knowing of its objectives to distribute and possess with intent to distribute a controlled substance and intending to join together with at least one other alleged conspirator to achieve those objectives (unity of purpose); and (4) that the scope of the conspiracy involved at least 500 grams of a mixture and substance containing a detectable amount of cocaine. See Third Circuit Model Jury Instructions § 6.21.846B; United States v. Gibbs, 190 F.3d 188, 197 (3d Cir. 1999). The government may prove these elements entirely by circumstantial evidence. See United States v. McGlory, 968 F.2d 309, 321 (3d Cir. 1992) (citing United States v. Kapp, 781 F.2d 1008, 1010 (3d Cir. 1986)).

"The existence of a conspiracy 'can be inferred from evidence of related facts and circumstances from which it appears as a reasonable and logical inference, that the activities of the participants . . . could not have been carried on except as the result of a preconceived scheme or common understanding.'" Id. (quoting Kapp, 781 F.2d at 1010). "The government need not prove that each defendant knew all of the conspiracy's details, goals, or other participants" but it must demonstrate that each drug transaction in which the defendant was involved was 'a step in achieving the conspiracy's common goal of distributing cocaine for profit.'" Id. (quoting United States v. Theodoropoulos, 866 F.2d 587, 593 (3d Cir. 1989).

At Petitioner's guilty plea hearing, the Court explained the conspiracy charge as well as the elements necessary to prove conspiracy. The Government then recited the facts to support each element of conspiracy, and the Petitioner admitted to his participation to each and his guilt while under oath.

In Pressler, the case cited by Petitioner in support of his argument, the Court of Appeals for the Third Circuit held that a buyer-seller relationship or a simple referral to purchase drugs is insufficient to establish a conspiracy. Pressler, 256 F.3d at 153-56. Here, however, the predicate facts that establish the elements of the conspiracy involve neither a buyer-seller relationship nor a simple referral to purchase drugs.

Petitioner was an integral member of the conspiracy, and without him, the drug deal may not have occurred. Specifically, Petitioner identified and made contact with the source of cocaine, organized the meetings, negotiated the transaction, and participated in each part of the deal including the final transaction. Although Petitioner may have thought his involvement was only as a referral source or to "vouch" for Womble, the facts of the transaction prove otherwise. Further, Petitioner admitted under oath to his participation in every element of the conspiracy during his guilty plea hearing, and the Government had ample evidence to support every element of conspiracy. Because the evidence as well as Petitioner's admissions establish the elements of conspiracy and not a mere referral or buyer-seller relationship, Petitioner's trial counsel was not ineffective for advising Petitioner that his actions were sufficient to support a conspiracy conviction. As such, there is no merit to Petitioner's first ground for relief.

Petitioner's second ground for relief is that his trial counsel was ineffective because he failed to investigate the facts of a prior crime used as a predicate offense towards Petitioner's career offender designation and also failed to object to the use of that prior crime for such designation. At issue is Petitioner's conviction for a drug offense in August 1997, for which he remained incarcerated through July 24, 1998,

and restricted to home confinement until November 9, 1998.

Petitioner argues that this conviction could not be utilized as

a predicate offense for a career offender designation because he

was released from imprisonment for this conviction in 1997,

before the fifteen year lookback period of the Sentencing

Guidelines.  See ECF No. 11 at 9.

The U.S. Sentencing Commission's Guidelines provide a

formula to determine a defendant's criminal history category,

which is utilized in determining a defendant's sentencing range.

Three points are added for each prior sentence of imprisonment

exceeding one year and one month.  See U.S.S.G. § 4A1.1(a).  The

"applicable time period" for whether a prior sentence "counts"

is defined as follows:

> Any prior sentence of imprisonment exceeding one year
> and one month that was imposed within fifteen years of
> the defendant's commencement of the instant offense is
> counted.  Also count any prior sentence of
> imprisonment exceeding one year and one month,
> whenever imposed, that resulted in the defendant being
> incarcerated during any part of such fifteen-year
> period.

U.S.S.G. § 4A1.2(e)(1).

The Probation Office and the Court correctly counted

Petitioner's 1997 offense because it falls within the scope of

the U.S. Sentencing Guideline's "applicable time period."  Here,

Petitioner was paroled on November 9, 1998, which is within the

fifteen year period preceding Petitioner's arrest for the

instant offense on October 2, 2012. Therefore, this offense was properly included and counted towards Petitioner's career offender designation because he remained incarcerated on it during the fifteen year period preceding his arrest pursuant to U.S.S.G. 4A1.2(e)(1). Petitioner's ground for relief thus fails because it rests upon an unsound factual basis - that he was released in 1997 and thus his prior offense was beyond the scope of U.S.S.G. 4A1.2(e)(1)'s lookback period. Because there is no merit to Petitioner's contention - he was not released until 1998, within the lookback period - it was likewise not ineffective for his trial counsel not to raise it. See United States v. Hall, No. 06-cr-2, 2010 U.S. Dist. LEXIS 43754, *8, 2010 WL 1816796, *3 (E.D. Pa. May 4, 2010) ("An attorney cannot be ineffective for failing to raise a claim that lacks merit.") (citing Moore v. Deputy Comm'r of SCI-Huntington, 946 F.2d 236, 245 (3d Cir. 1991)).

Petitioner's third ground for relief is that his trial counsel failed to object to and argue against statements made regarding his co-defendant's propensity for violence. ECF No. 11 at 10-11. The discussion of his co-defendant's violence during his sentencing hearing, Petitioner argues, influenced the Court in its decision to impose a greater sentence than what he would have otherwise received. Id.

Contrary to Petitioner's assertion, Petitioner's trial counsel argued at length that Petitioner was not a violent person, had no history of violent crime, and that the proposed sentencing range - higher than one would ordinarily expect for a non-violent offense - should be decreased because of Petitioner's non-violent history.  No. 13-cr-95, ECF No. 25 at 10-11.  Indeed, even counsel for the Government acknowledged trial counsel's effective argument and agreed with the assessment that Petitioner has no history of violence.  No. 13-cr-95, ECF No. 25 at 24 ("Mr. Sparaco said that Mr. Rosario is not a violent man, he's not a violent person.  And it's true, there's no criminal history of violence.").

Although the Government identified the inherent danger in drug trafficking and the violence of his co-defendant, no violent aspersions were cast upon Petitioner.  During the brief reference to Petitioner's co-defendant's gun, the Court even noted that "[t]o be clear, there is no indication that the gun was Mr. Rosario's."  The Government agreed and admitted it was his co-defendant's, stated that the proposed sentencing guideline range "is an extraordinarily long amount of time" and "an outrageously long period of time," and argued that Petitioner should receive a sentence at the bottom of or below the proposed guidelines.

In light of the Government's concession regarding the length of sentence, Mr. Sparaco continued to advocate for a below guidelines sentence.  This was a reasonable tactical decision by Mr. Sparaco, because no dispute existed as to Petitioner's non-violent nature and history.  Furthermore, trial counsel's arguments regarding Petitioner's lack of violence and imposing a sentence below the guidelines range were effective, because the Court identified Petitioner's lack of violence as a reason for granting a two-level downward variance.

Mr. Sparaco's lack of objection to the statement about Petitioner's co-defendant does not constitute conduct outside the wide range of professionally competent assistance.  Nor was Petitioner prejudiced by this fact, as an objection would have had no impact on his sentence issued by the Court.  Even if Petitioner could demonstrate ineffectiveness on the part of his trial counsel, any such alleged error could not give rise to the requisite prejudice needed to sustain Petitioner's claim because the sentence issued would not have been different.  <u>See</u> <u>Strickland</u>, 466 U.S. at 691 ("An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment."); <u>see</u> <u>also</u> <u>United States v. Hall</u>, No. 06-cr-2, 2010 U.S. Dist. LEXIS 43754, *8, 2010 WL 1816796, *3 (E.D. Pa. May 4, 2010) ("An attorney cannot be ineffective for failing to

raise a claim that lacks merit.") (citing Moore v. Deputy Comm'r of SCI-Huntington, 946 F.2d 236, 245 (3d Cir. 1991)).  For these reasons, Petitioner's third ground for relief will be denied.

Petitioner's fourth and final ground for relief is that his appellate counsel was ineffective for failing to raise meritorious issues on appeal.  Specifically, Plaintiff states that his appellate counsel should have raised such issues as the insufficient basis for his guilty plea and the improper use of a crime as a predicate offense for his career offender designation, rather than urging him to withdraw his appeal.

"[I]n order to prevail on a claim that appellate counsel was ineffective, a petitioner must show not only that counsel's performance fell below an objective standard of reasonableness, but also that there was a reasonable probability, but for counsel's deficiency in raising the arguments on appeal, that the conviction would have been reversed on appeal."  Reid v. Ricci, No. 07-cv-3815, 2008 WL 2984207, *9 (D.N.J. July 21, 2008) (citing Buehl v. Vaughn, 166 F.3d 163, 173-74 (3d Cir. 1999)).  Petitioner's fourth ground for relief fails because he has not identified any meritorious issue for appeal.  As discussed above in grounds one, two, and three, the issues Petitioner wishes his appellate counsel would have raised on appeal have no merit.  Here, Petitioner willingly pled guilty and admitted to conduct that would establish the elements of

conspiracy.  Likewise, his 1997 sentence was properly included under the Sentencing Guidelines, and his attorney did, in fact, effectively argue that he was not violent.  It was thus not objectively unreasonable for his appellate counsel not to raise these meritless issues on appeal.  See Reid, 2008 WL 2984207, at *9.  See United States v. Hall, 2010 U.S. Dist. LEXIS 43754, *8, 2010 WL 1816796, *3 ("An attorney cannot be ineffective for failing to raise a claim that lacks merit.") (citing Moore, 946 F.2d at 245).  Further, Petitioner cannot demonstrate prejudice as to this ground, because he has not demonstrated a reasonable probability that an appeal would have resolved in his favor but for counsel's alleged error.  For these reasons, Petitioner's final ground for relief will be denied.

IV.  EVIDENTIARY HEARING

An evidentiary hearing is not warranted here because Petitioner has failed to meet his burden of demonstrating that he is entitled to relief.  An evidentiary hearing is not warranted when the files and records of the matter conclusively show that the petitioner is entitled to no relief.  See 28 U.S.C. 2255(b).  Because Petitioner has failed to show that he is entitled to relief, the Court will decline to order an evidentiary hearing.

V.  CERTIFICATE OF APPEALABILITY

The Court will deny a certificate of appealability because Petitioner has not demonstrated "a substantial showing of the denial of a constitutional right" as required by 28 U.S.C. § 2253(c)(2). <u>See</u> <u>Miller-El v. Cockrell</u>, 537 U.S. 322, 327 (2003).

VI. CONCLUSION

For the foregoing reasons, the Court will deny the Petition and decline to issue a certificate of appealability. An appropriate order follows.


Dated: <u>September 18, 2018</u>          <u>s/Noel L. Hillman</u>
At Camden, New Jersey          NOEL L. HILLMAN, U.S.D.J.